J-A13045-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                        :         PENNSYLVANIA
                                          :

            v.                    :

TERON D. LEWIS              :
                                          :
          Appellant          :    No. 290 EDA 2021

Appeal from the PCRA Order Entered January 4, 2021
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0003255-2011

BEFORE:   BENDER, P.J.E., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:           **FILED JULY 1, 2021**

Appellant Teron D. Lewis appeals from the order of the Court of Common Pleas of Chester County denying his petition pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546. Appellant claims his trial counsel was ineffective in failing to call a particular witness in order to impeach one of the prosecution's eyewitnesses. We affirm.

We adopt the summary of the factual background of this case from the trial court opinion resolving Appellant's direct appeal:

> The evidence showed that in these crimes of retribution, during the hours of darkness on May 22, 2013, the victim, Odell Cannon, was approached by two assailants as he exited a house located at 712 East Chestnut Street in the City of Coatesville, Chester County, PA. The assailants approached from two directions, Appellant, Teron Lewis, from the front of that property, and

---

[*] Former Justice specially assigned to the Superior Court.

Omega Peoples, Appellant's co-conspirator, from Diamond Alley, which abuts the rear of that property.

The Commonwealth presented substantial evidence from which the jury could conclude, which it did, that Appellant, Teron Lewis shot Odell Cannon six times as Cannon walked through the side and back yard of the above residence toward Diamond Alley. [Appellant] then fled the scene, but was later connected to these crimes and arrested. Within minutes after the shooting, Appellant's co-conspirator[, Peoples,] was found nearby, wounded and hiding under a minvan parked next to Diamond Alley, the alley that bordered the backyard of the 712 East Chestnut property, where the shooting occurred.

The victim, Mr. Cannon, a convicted felon, was wearing body armor, and was armed with a Sturm Ruger .357 Magnum revolver, from which the Commonwealth's evidence proved he fired six rounds at his assailants. From the evidence, the jury could properly infer that Omega Peoples, who was shot three times during the encounter by Mr. Cannon, and unable to flee, was purposely trying to hide nearby from police, who had descended in force upon the shooting scene and the surrounding area. Peoples was convicted by a jury in an earlier trial.

The Commonwealth's evidence was that Teron Lewis approached and shot Odell Cannon as Mr. Cannon walked through the side and back yards of 712 East Chestnut Street, accompanied by a female companion, Mona Perez. Ms. Perez ran uninjured from the scene, but was later identified by police and testified at Appellant's trial that she recognized Appellant, whom she had known for some 15 years, as the assailant whose bullets actually struck Cannon. Ms. Perez identified Appellant from the clothing he was wearing at the time of the shooting, which she had seen him wearing earlier that day, from his body build, and from the manner he carried himself, his walk, his gate [sic], and body movements.

\*\*\*

[In addition,] Rahlik A. Gore, an admitted felon under federal supervision testified on behalf of the Commonwealth. Gore was in the company of Mr. Cannon on May 21, 2013, the day before the shooting, during which they traveled in Cannon's Buick from Coatesville to Philadelphia, returning before midnight that day. They parked the Buick in a small parking lot off Diamond Alley not far from the scene of the shooting. Later than night, a Blue Van, identified as the Van under which Peoples was found hiding

- 2 -

following Cannon's shooting, parked in the same lot, two parking spots removed from Cannon's Buick.

Both Gore and Cannon were armed[;] Gore with a 9 millimeter semi-automatic and Cannon with a .357 Magnum. The men went armed for protection because of a dispute then in progress between two Coatesville criminal factions. Both men went directly into the house at 712 East Chestnut Street, where Gore had been staying for the past two months with Ronette Shelton, a female friend.

Within the span of 5 to 10 minutes, Ms. Shelton[,] accompanied by Appellant Teron Lewis[,] arrived at 712 East Chestnut Street, entering from the front door into the living room, where Cannon and Gore were seated on a couch conversing. In his testimony, Gore referred to Appellant as Peoples' "little homie," also known as a "young boy."

As Shelton and Appellant went upstairs, Cannon made a remark to Gore, which created concern in his mind, and Gore immediately followed Appellant upstairs, where he found Appellant on his cell phone, "chirping" to Peoples, whose nickname, "Kat," Gore could observe on the phone's screen. Gore pointedly told Appellant "not to bring trouble in the house," and Appellant replied he wouldn't. Appellant came downstairs momentarily and remained on his cell phone in the kitchen, at which point Gore told Appellant to leave the house, which he did. Cannon then asked Gore to shoot Appellant, but Gore refused.

A van was soon thereafter observed by Gore picking up Appellant at the corner of 7th and Chestnut Street. Cannon then left the house, following which Gore eventually went upstairs to prepare for bed. While undressing, he saw through his bedroom window the flash from a gun, then heard a shot, picked up his gun and ran outside, at which point he saw Appellant run up Diamond Alley toward 6th Street.

Gore identified Appellant from his height and build and from his clothing, the same gray hoodie and blue jeans he observed Appellant wearing earlier at the house. In all, Gore heard 7 to 8 gun shots between the first shot and his arrival in the yard. Cannon crawled over to Gore, screaming that he had been shot.

When Gore saw a police officer walk into the yard[,] he went into the house, packed his bag and left the house, not wanting the police to see him with a gun. Gore also testified that he was

- 3 -

present 2 days before Cannon's shooting when he witnessed T.J. Gardner, Cannon's associate, shoot twice at Peoples, who was driving a red car in the area of 7th Avenue and Chestnut Streets, in the City of Coatesville.

Trial Court Opinion (T.C.O.), 5/9/13, at 3-7 (paragraph spacing added and citations omitted).

On October 19, 2012, a jury convicted Appellant of attempted murder, aggravated assault, aggravated assault causing bodily injury with a deadly weapon, conspiracy to commit first-degree murder, and conspiracy to commit aggravated assault. On January 11, 2013, the trial court imposed an aggregate sentence of 22½ to 45 years' imprisonment.

Appellant filed a timely post-sentence motion, which the trial court denied. On December 14, 2014, this Court affirmed the judgment of sentence, finding that Appellant waived all his issues on appeal due to his failure to file a timely concise statement pursuant to Pa.R.A.P. 1925(b). **Commonwealth v. Lewis**, 849 EDA 2013 (Pa.Super. 2014).

On November 24, 2015, Appellant filed a *pro se* PCRA petition and the PCRA court appointed counsel, who subsequently filed an amended petition on Appellant's behalf. On June 20, 2016, the trial court issued an order allowing Appellant to file a direct appeal *nunc pro tunc*.

On January 24, 2017, this Court again affirmed the judgment of sentence. **Commonwealth v. Lewis**, 2308 EDA 2016 (Pa.Super. 2017). On January 26, 2017, the Supreme Court denied Appellant's petition for allowance of appeal. **Commonwealth v. Lewis**, 642 Pa. 109, 169 A.3d 1066 (2017).

On March 5, 2018, Appellant filed another PCRA petition. The PCRA court appointed counsel, who filed an amended petition. On August 25, 2020, the parties entered into a stipulation of facts in lieu of an evidentiary hearing, which included an affidavit of trial counsel, Stephen Delano, Esq.

On September 23, 2020, the PCRA court notified Appellant of its intent to dismiss his petition without a hearing pursuant to Pa.R.Crim.P. 907. On November 30, 2020, Appellant filed a response to the Rule 907 notice. On January 4, 2021, the PCRA court denied Appellant's petition. This timely appeal followed.

Appellant raises the following issue for our review on appeal:

Did the PCRA court commit an abuse of discretion by denying Appellant PCRA relief on his claim asserting that trial counsel provided ineffective assistance of counsel by failing to investigate and call Detective Martin Quinn as a defense witness and for not investigating and interviewing Ms. Perez concerning prior testimony she may have given concerning the instant matter?

Appellant's Brief, at 3.

In reviewing the denial of a PCRA petition, our standard of review is well-established:

[o]ur review of the grant or denial of PCRA relief is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. *Commonwealth v. Cox*, 636 Pa. 603, 146 A.3d 221, 226 n.9 (2016). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Burton*, 638 Pa. 687, 158 A.3d 618, 627 n.13 (2017).

*Commonwealth v. Small*, 647 Pa. 423, 440–41, 189 A.3d 961, 971 (2018).

Appellant claims his trial counsel rendered ineffective assistance in (1) failing to call Detective Martin Quinn to testify and (2) failing to properly investigate the prior testimony of Detective Quinn and Mona Perez in a related criminal trial. Our review is guided by the following principles:

> [a]s originally established by the United States Supreme Court in **Strickland v. Washington**, 466 U.S. 668, [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), and adopted by Pennsylvania appellate courts, counsel is presumed to have provided effective representation unless a PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error.
>
> **Commonwealth v. Wantz**, 84 A.3d 324, 331 (Pa.Super. 2014) (citations omitted). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." **Commonwealth v. Daniels**, 600 Pa. 1, 963 A.2d 409, 419 (2009).

**Commonwealth v. Selenski**, 228 A.3d 8, 15 (Pa.Super. 2020).

With respect to the reasonable basis prong, "[g]enerally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." **Commonwealth v. Koehler**, 614 Pa. 159, 36 A.3d 121, 132 (2012) (quotations and citation omitted). To sustain a claim of ineffectiveness, Appellant must prove that the strategy employed by trial counsel "was so unreasonable that no competent lawyer would have chosen that course of

conduct." ***Commonwealth v. Rega***, 593 Pa. 659, 696, 933 A.2d 997, 1018–19 (2007) (citation omitted).

Further, to satisfy the prejudice prong, "the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." ***Selenski***, 228 A.3d at 16 (quoting ***Commonwealth v. Spotz***, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations, quotation marks, and quotations omitted)).

With respect to claims of ineffectiveness based on counsel's failure to call a witness, our courts have provided the following:

> [i]n establishing whether defense counsel was ineffective for failing to call witnesses, appellant must prove: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial.

***Commonwealth v. Treiber***, 632 Pa. 449, 498, 121 A.3d 435, 463–64 (2015) (quoting ***Commonwealth v. Puksar***, 597 Pa. 240, 951 A.2d 267, 277 (2008) (citation omitted)).

Appellant's argument centers on his assertion that trial counsel was "ineffective for not investigating and producing evidence indicating that Ms. Perez, a key Commonwealth witness, did not identify Appellant as the shooter during a police interview conducted a day after the shooting of Cannon." Appellant's Brief, at 9. Appellant asserts that the Commonwealth had "implied

throughout the trial that Perez had identified [A]ppellant as the shooter during the interview." *Id*.

Appellant asserts trial counsel could have properly undermined Ms. Perez's testimony if he had interviewed Detective Martin Quinn, properly reviewed the prior testimony of Detective Quinn and Ms. Perez regarding the shooting, and called Detective Quinn as a witness at Appellant's trial.

Prior to Appellant's October 2012 trial in state court in the instant case for shooting Cannon, Detective Quinn and Ms. Perez testified at Cannon's trial in December 2006 in federal court where Cannon was prosecuted for federal weapon charges. Appellant claims that, at Cannon's federal trial, Detective Quinn testified that Ms. Perez could not identify the person that shot Cannon in a police interview.

Appellant points to the following portion of Detective Quinn's testimony on cross-examination, in which he stated:

> In her interview, [Ms. Perez] could never identify the person who shot Mr. Cannon. We discussed a person by the name of Terone [sic] Lewis, so I used the photo array, Who are you speaking of? In this aspect of Terone [sic] Lewis, she picks out number 5 as the person that we were discussing, not the person who she could identify as being the shooter of Mr. Cannon.

Notes of Testimony (N.T.), Cannon's federal trial, 12/14/06, at 130.

However, we note in reviewing this particular statement in context of Detective Quinn's entire testimony, it appears that Detective Quinn was explaining that Ms. Perez could not provide a positive facial identification of the shooter as Ms. Perez admitted that she did not see the shooter's face. Ms.

Perez told officers she believed the shooter was a man named "Terone" based on his clothes, stature, gait, and other physical characteristics. When the officers subsequently presented Ms. Perez with a photo array, it was not to identify the shooter, but to identify the person Ms. Perez was referring to that she believed matched the physical characteristics of the shooter.

In a subsequent exchange on redirect examination, Detective Quinn explained this distinction:

> [Question:] And when you say that Mona Perez's interview, Mona Perez said that it was Terone [sic] Lewis was the shooter, right?
> [Detective Quinn:] No, sir.
> [Question:] So you disagreed with the videotape?
> [Detective Quinn:] If you watch the videotape, if I recall correctly, sir, I asked her a pointed question, are you telling me that the person you had seen during the night of the shooting is that you can identify him by face which I need for probable cause to make an arrest, are you able to identify that person by face or are you telling me that the person you had seen, Mr. Lewis, was wearing the same clothes prior to the shooting incident earlier in the evening? So she never identified him as being the shooter. Only describing the clothing where she had seen him at earlier in the west end of Coatesville but never saying and giving me enough to file charges against [Appellant] as the shooter of your client.

N.T., Cannon's federal trial, 12/14/06, at 135-36.

Ms. Perez consistently admitted in all her accounts of the shooting, including her testimony including in trials of both Cannon and Appellant, that she did not see the shooter's face, but "believed" Appellant was the shooter based on his clothing, size, stature, and other physical characteristics. At Cannon's federal trial, Ms. Perez testified as follows:

[Question:] All right. This person, [who you saw pull out a weapon out and began to fire] were you able to identify and recognize that person?
[Ms. Perez:] No, I didn't.
[Question:] Pardon me?
[Ms. Perez:] He had – I recognized his clothes and his height and his weight but I did not see a face.
[Question:] I understand you did not see a face. But the height, the clothing, height and weight cause [sic] you to identify someone, correct?
[Ms. Perez:] Yes.

***

[Question:] Describe this person.
[Ms. Perez:] He was about his height, he was a little tall, he had on a gray sweat jacket. I believe his name was Terone [sic].
[Question:] You believe his name was what?
[Ms. Perez:] Terone [sic].
[Question:] And you believed his name was Terone [sic]. Can you describe the clothing that you believe Terone [sic] was wearing that night?
[Ms. Perez:] Yes, I do. He had on a gray sweat jacket or it was velour with green in it. Green and gray, he had on blue jeans.
[Question:] And was there a hoodie?
[Ms. Perez:] Yes, it was a hood. Hooded. I did not see the face but I recognized the clothes.
[Question:] This young person was about what age?
[Ms. Perez:] Anywhere from 21 to 23.
[Question:] And how would you describe his build?
[Ms. Perez:] Slim weight, slim.
[Question:] This is a person that you knew, correct?
[Ms. Perez:] Correct.
[Question:] And do you remember being interviewed by Detective Quinn?
[Ms. Perez:] Yes, I do.
[Question:] And do you remember Detective Quinn asking you about the description of this person that you saw?
[Ms. Perez:] Yes, I do.
[Question:] That evening, correct? Do you remember how you referred to him?
[Ms. Perez:] Terone [sic] or Deron.
[Question:] Terone [sic]?
[Ms. Perez:] Yes.
[Question:] Do you remember how you referred to him in terms of a description of who he was?

- 10 -

[Ms. Perez:] Yes.

[Question:] What did you say?

[Ms. Perez:] I told him that I recognized him from – I had seen him earlier that day when he was out and about and he had the same clothes on. Also, I was told that he was seen out there before.

N.T., Cannon's federal trial, 12/6/06, at 69-71.

At Appellant's subsequent trial on October 16, 2012, Ms. Perez consistently testified that she did not see the shooter's face, but believed the shooter could have been Appellant based on the clothes she had seen him wearing earlier in the day, his height, his build, and other physical characteristics.

[Question:] Now, Ms. Perez, this person who came in through the gate behind you and Mr. Cannon, what was he wearing the person who came in and ran by you shooting?

[Ms. Perez:] A green and gray hooded sweat jacket and blue jeans.

[Question:] All right. And did that outfit look familiar to you?

[Ms. Perez:] Yes, it did.

[Question:] Had you seen someone earlier that day wearing the same clothes?

[Ms. Perez:] Yes, I did.

[Question:] And with respect to the person you had seen wearing the same clothes, who was it?

[Ms. Perez:] Teron Lewis, I believe.

[Question:] And with regard to Teron Lewis, how long had you known Mr. Lewis?

[Ms. Perez:] I knew of him for years, I guess I could say 12, 15 or something.

[Question:] Okay. So with regard to your knowing Teron Lewis for 12 or 15 years, was he someone who you would recognize if you saw him?

[Ms. Perez:] Yes.

[Question:] And this person who came in through the gate behind you and Mr. Cannon who ran by shooting, how did his height compare with Mr. Lewis.

[Ms. Perez:] They looked about the same.

[Question:] How did this person's build compare with Mr. Lewis?

- 11 -

[Ms. Perez:] They looked the same.

[Question:] And with regard to this person who came from behind, ran up and started shooting at you and Mr. Cannon right next to you, could you tell whether he was shooting at Mr. Cannon or shooting at you or both of you?

[Ms. Perez:] Well, I would say both of us, we was standing right next to each other.

[Question:] Did you have any reason to think that anyone would want to shoot you?

[Ms. Perez:] No.

[Question:] So with regard to the person who came through the gate, ran up and started shooting, did you know who he was?

[Ms. Perez:] I'm sorry?

[Question:] Did you know who he was?

[Ms. Perez:] I thought I knew.

[Question:] You thought you knew. And who did you think this was?

[Ms. Perez:] It might have been Teron.

[Question:] You say it might have been.

[Ms. Perez:] Yeah.

[Question:] Well, as you sit here today, are you certain that it was Mr. Lewis?

[Ms. Perez:] I'm sure because of the clothes, maybe, but he had a hoodie covering his face, so I didn't see his face.

[Question:] Okay. In terms of your being able to see the shooter's face, did you see his face?

[Ms. Perez:] No.

[Question:] Putting aside the fact that you didn't see his face based on what you saw, his height, his build, the same clothes, the way he moved, were you certain that it was, in fact, Mr. Lewis?

[Ms. Perez:] Yeah.

[Question:] And this Mr. Lewis that you were sure was the shooter if you saw him today, would you recognize him?

[Ms. Perez:] Yes, I would.

[Question:] And if you look in this courtroom, do you see the Teron Lewis that you knew on May 22 of '06 who you saw shooting at you and Mr. Cannon.

[Ms. Perez:] Yes.

N.T., Appellant's trial, 10/16/12, at 120-22.

Notwithstanding this testimony, Appellant argues that Ms. Perez testified inconsistently with respect to whether she was able to identify

Appellant as the shooter when the police presented her with a photo array after the shooting. Appellant points to the following exchange:

> [Question:] Now, this person that you picked, *this shooter*, do you know him?
> [Ms. Perez:] Yes.
> [Question:] And who is he?
> [Ms. Perez:] It's Teron Lewis.

N.T. Appellant's trial, 10/16/12, at 122 (emphasis added). As such, Appellant claims that Detective Quinn's federal testimony, in which he claims that Ms. Lewis could not identify the shooter, directly refutes this exchange between the prosecutor and Ms. Perez.

We agree with the trial court's determination that the prosecutor asked an "confusing and inaccurate" question when he suggested that Ms. Lewis had identified the shooter in the photo array, knowing that Ms. Perez had repeatedly and consistently testified that she did not see the shooter's face, but indicated that she believed the shooter could have been Appellant based on his clothing, stature, and other physical characteristics.

In viewing the entire record, we agree with the trial court's determination that there is no inconsistency between Detective Quinn's federal trial testimony and Ms. Perez's testimony throughout Appellant's prosecution. As a result, there is no arguable merit to Appellant's claim that trial counsel was ineffective in failing to call Detective Quinn to testify in order to refute Ms. Perez's testimony.

In addition, we find that trial counsel articulated a reasonable basis to support his decision to choose not to offer Detective Quinn as a witness for

- 13 -

the defense at Appellant's trial. Trial counsel, in an affidavit submitted to the PCRA court, averred that he reviewed all the relevant transcripts and testimony of both Detective Quinn and Ms. Perez. Trial counsel asserted that he did not call Detective Quinn as a witness as he felt his testimony would not have aided the defense, but rather would have provided the prosecution another opportunity to confirm that Ms. Perez consistently claimed that she could not provide a facial identification of the shooter, but surmised the shooter was Appellant as his physical attributes matched those of the shooter.

Moreover, we reject Appellant's claim that he was prejudiced by trial counsel's decision not to call Detective Quinn to testify. As noted above, there is no inconsistency between Detective Quinn's testimony and Ms. Perez's account that her identification was not based on facial recognition but other factors related to the shooter's appearance. Ms. Perez's testimony was corroborated by prosecution witness, Rahlik Gore, who testified that he saw Appellant fleeing the crime scene as Gore ran to Ms. Cannon's aid. As such, Appellant did not show there was a reasonable probability that, but for counsel's decision not to call Detective Quinn to testify, the result of the proceedings would have been different.

Accordingly, we conclude that the PCRA court did not err in determining that trial counsel provided Appellant effective representation in properly investigating the prior testimony of Detective Quinn and Ms. Perez and in refraining from calling Detective Quinn to testify at Appellant's trial.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/1/2021</u>